**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KAREN A. WILSON,** | No. 13–cv–3346 |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **THE NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY ('DCP&P') (formerly Division of Youth & Family Services), KARA P. WOOD, in her official capacity as Director of DCP&P, ALLISON BLAKE, in her official capacity as the Commissioner of the Department of Children and Families, KATHY CORAIN, in her individual capacity, GILLIAN BATTS, in her individual capacity, JANET DASILVA, in her individual capacity, SUSAN DEPRETENTS, in her individual capacity, ODELIZIO ROSARIO, in her individual capacity, MARIA LUGO, in her individual capacity, FRANK J. DYER in his individual capacity, CAROL PERSONETTE-DOYLE, in her individual capacity, GERALDINE LIVENGOOD, in her individual capacity, and John Does 1–15,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

  The plaintiff, Karen A. Wilson ("Wilson"), brings this action alleging that the defendants committed constitutional, federal statutory, and state statutory violations during the process of removing her child from her care and eventually terminating her parental rights. This matter comes before the Court on two motions: a motion for summary judgment, filed by Frank Dyer (DE 69); and a motion for summary judgment, filed by Gillian Batts, Allison Blake, Janet Dasilva, Odelizio Rosario, the New Jersey Division of Child Protection

1

and Permanency (hereinafter, "DCCP"), and Kara P. Wood (collectively, the "state defendants"). (DE 74).[1]

For the reasons set forth below, the defendants' motions for summary judgment are granted.

## I.    BACKGROUND

### A. The Parties

On May 28, 2013, Wilson filed a complaint (DE 1 or "Comp.") against:

A.   DCPP (formerly Division of Youth & Family Services ("DYFS")), a New Jersey child protection and welfare agency within the Department of Children and Families;

B.   Kara P. Wood in her official capacity as Director of DCPP;

C.   Allison Blake in her official capacity as the Commissioner of the Department of Children and Families;

D.   Kathy Corain, a nurse in St. Joseph's Hospital in Paterson, New Jersey, in her individual capacity;

E.   Gillian Batts, a DCPP child protective services worker, in her individual capacity;

F.   Janet Dasilva, a DCPP supervisor of child protective services workers, in her individual capacity;

G.   Susan Depretents, a Passaic County social worker, in her individual capacity;

H.   Odelizio Rosario, a DCPP child protective services worker, in her individual capacity;

I.   Maria Lugo, a DCPP child protective services worker, in her individual capacity;

---

[1]    Record items will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

"DE __" =    Docket Entry in this case

"Comp." =    Complaint (DE 1)

J. Frank J. Dyer, a psychological expert for DYFS/DCPP, in his individual capacity;

K. Carol Personette-Doyle, the court appointed law guardian for Wilson's biological daughter, in her individual capacity;

L. Geraldine Livengood, a New Jersey Deputy Attorney General, in her individual capacity; and

M. John Does 1–15.

(Comp. ¶¶ 2–18).[2]

### B. Procedural History

Wilson's complaint alleges the following eight claims for relief:

1. § 1983 violations of the Fourteenth Amendment[3] by DCPP, Wood, and Blake for failure to properly promulgate rules and train those in their command who allegedly committed abuses of process during their investigation. Wilson requests an injunction requiring the formulation of explicit instructions and policies against abuse of process. (Comp. ¶¶ 59–66)

2. §§ 1983 and 1986 violations of the Fourteenth Amendment[4] by DCPP, Wood, and Blake, for a policy or custom of improper hiring and inadequate training that led to alleged abuses of process and deliberate

---

[2]    Defendants Kathy Corain, Susan Depretents, and Maria Lugo have not answered or moved in response to the Complaint.

[3]    In addition to the Fourteenth Amendment, this count of the Complaint inexplicably cites the Fourth Amendment. (*See* Comp. ¶ 65). The plaintiff has not argued that there was a Fourth Amendment violation in her brief. I will therefore disregard this aspect of her claim.

[4]    This count includes a citation to the Sixth Amendment, but no facts or explanation of how the Sixth Amendment was allegedly violated. The complaint merely generally refers to the guarantees of a speedy and public trial and the assistance of counsel in criminal cases, but does not explain how these provisions relate to a "custom and policy of allowing abuse of process" or the defendants' alleged "failure to properly hire, supervise, train, discipline, and control child protective services workers under their command." (Comp. ¶¶ 70, 71). The plaintiff does not mention the Sixth Amendment in her opposition brief. (*See generally* DE 95). Therefore, I will construe this count solely under the Fourteenth Amendment.

indifference to the rights of persons including Wilson. Wilson requests the same injunction as in Count 1. (Comp. ¶¶ 67–72)

3. § 1985 conspiracy by all defendants to violate Wilson's civil rights through the alleged abuses of process. Wilson requests $10 million in damages, $50 million in punitive damages, counsel fees, costs of suit, interest, damages for pain and suffering, and other appropriate relief. (Comp. ¶¶ 73–76)

4. § 1983 violations by all defendants of Wilson's due process and equal protection rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments for alleged policies, conduct, acts, and omissions that excessively interfered with Wilson's fundamental rights to privacy and freedom to raise a family. Wilson requests the same relief as in Count 3. (Comp. ¶¶ 77–83)

5. § 1983 violations by all defendants of the First, Fourth, Sixth, Eighth, and Fourteenth Amendments for depriving Wilson of her due process rights, her rights to be free from excessive interference with family relationships, and her rights to speak freely about the defendants' conduct without fear of reprisal and retaliation. Wilson requests the same relief as in Count 3. (Comp. ¶¶ 84–93)

6. § 1983 violations by all defendants under the First and Fourteenth Amendments for retaliating against Wilson's opposition to defendants' alleged unlawful practices. Wilson requests the same relief as in Count 3. (Comp. ¶¶ 94–103)

7. Violations of Wilson's rights under Title II of the Americans with Disabilities Act ("ADA"), (42 U.S.C. §§ 12131–12165), for failing to provide plaintiff with services to protect her rights and using her disabilities as a means to deprive her of those rights. Wilson requests the same relief as in Count 3. (Comp. ¶¶ 104–09)

8. Violations of the above rights under the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6–1 to –2. Wilson requests the same relief as in Count 3. (Comp. ¶¶ 110–13)

Defendant Frank Dyer filed an answer on October 31, 2013. (DE 4). The state defendants filed a motion to dismiss the complaint in February 2014, which Frank Dyer joined. (DE 9; DE 15).

On January 25, 2016, I issued an Opinion and Order denying in part and granting in part defendants' motion to dismiss. (DE 31; DE 32); *Wilson v. The New Jersey Div. of Child Prot. & Permanency*, No. 13-3346, 2016 WL 316800 (D.N.J. Jan. 25, 2016). Specifically, I dismissed Counts 1 and 2 against the DCPP on Eleventh Amendment grounds. (DE 31 at 12). I also dismissed Counts 3–6 against the DCPP, and Wood and Blake (in their official capacities), on Eleventh Amendment grounds. (DE 31 at 10–11). I dismissed Count 8 as to the official defendants—DCPP, Wood, and Blake—on the same sovereign immunity grounds as Counts 3–6, as courts have applied § 1983 sovereign immunity reasoning in parallel fashion to bar NJCRA claims for damages against the state, its entities, and officers. (DE 31 at 12–13). I also dismissed all claims against Livengood and Personette-Doyle, who enjoy absolute immunity as the Deputy Attorney General representing the State of New Jersey in Wilson's parental termination proceedings and the court-appointed law guardian representing Wilson's daughter, respectively. (DE 31 at 16–17).

The following chart lays out which claims I dismissed and which claims remain:

| Claim | Relief sought | Against | Dismissed against | Defendants remaining |
|---|---|---|---|---|
| **1 & 2** §§ 1983, 1986 | Injunction | Official defendants | DCPP | Wood, Blake |
| **3** § 1985 conspiracy | Damages | All defendants | Official defendants; Livengood; Personette-Doyle | Individual defendants *except* Livengood and Personette-Doyle |
| **4, 5 & 6** § 1983 | Damages | All defendants | "       " | "       " |
| **7** ADA Title II | Damages | All defendants | Livengood; Personette-Doyle | Official defendants; Individual defendants *except* Livengood and Personette-Doyle |
| **8** NJCRA | Damages | All defendants | Official defendants; Livengood; Personette-Doyle | Individual defendants *except* Livengood and Personette-Doyle |

"Official Defendants" = DCP&P, Wood, and Blake
"Individual Defendants" = all other defendants except Kathy Corain, Susan Depretents, and Maria Lugo, who have not answered or moved in response to the complaint.
"All defendants" = Official Defendants plus Individual Defendants

(DE 31 at 19).

The state defendants filed an answer on February 26, 2016. (DE 39). After the close of discovery, Frank Dyer filed a motion for summary judgment on January 11, 2019. (DE 69; DE 70). The state defendants filed their own motion for summary judgment on the same day. (DE 74). These are the present motions before the Court.

### C. Facts

The New Jersey courts terminated Karen Wilson's parental rights over her daughter, and that decision was affirmed on appeal. The complaint alleges a factual narrative that at times diverges sharply from the factual findings of

6

the state trial court as recited in the appellate opinion affirming the parental termination decision. That appellate opinion held that the evidence reviewed by the trial court "amply satisfied the statutory standard for termination of parental rights." *Compare* Comp. *with N.J. Div. of Youth & Family Servs. v. K.W.*, No. A–5416–10T2, 2012 WL 1581252 (N.J. Super. Ct. App. Div. May 8, 2012) (herein, "State Appellate Decision"), *cert. denied*, 212 N.J. 199, 52 A.3d 177 (2012). The complaint discusses abuses of process in the immediate removal of Wilson's child after birth and Wilson's subsequent interactions with the defendants throughout the termination proceedings, while the State Appellate Decision depicts a failed, resource-intensive, four-year effort to teach Wilson the skills necessary to raise her child. (*Id.*).

On October 26, 2007, Wilson gave birth to a daughter, Kate,[5] at St. Joseph's Hospital in Paterson, New Jersey. (DE 91 ¶ 1; DE 102-1 ¶ 5). Kate has certain serious medical ailments that, as of 2011, required medication for chronic dermatitis, possible medication for grand mal seizures, and yearly medical visits to monitor a "skipped heartbeat." (DE 96 ¶ 2).[6]

Prior to giving birth, Wilson expressed concerns to a social worker at the hospital about Kate's biological father, Donald Wilson, who had been physically and verbally abusive to her, and said she wanted help finding an alternative

---

[5]    "Kate" is a fictitious name used by the State Appellate Decision; I use it in this Opinion as well.

[6]    *See also* State Appellate Decision, 2012 WL 1581252, at *2 ("A medical evaluation of Kate revealed that she was suffering from serious and wide-ranging medical problems, which compounded the challenges that would face [Wilson] if Kate were returned to her care. Although Kate had no abnormalities at birth, she developed a number of serious health problems and developmental disabilities, including an irregular heartbeat, a spinal abnormality, a seizure disorder, and a brain malformation, which typically requires surgical intervention. By the time Kate was two years old, she had regressed considerably in all areas of child development: she was no longer able to walk up the stairs without assistance, reverted to crawling, began walking in a[n] abnormal fashion and lost the few words that she had been able to say. Her loss of speech resulted in behavioral problems including increased frustration and the throwing of objects. She also began to deliberately and repeatedly bang her head against the wall. As a result of these conditions, Kate required extensive physical, speech and language therapy.").

home to take care of Kate.[7] (DE 91 ¶ 2; DE 96 ¶ 4). That social worker then contacted DYFS (now DCPP).[8] (DE 96 ¶ 5). After an assessment by DCPP and a court hearing, DCPP removed Kate from Wilson at the hospital and placed Kate in a foster home around October 31, 2007. (DE 91 ¶ 3; DE 91 at 14).[9] Wilson was granted certain visitation rights with Kate and was also ordered to complete a neurodevelopmental evaluation, parenting classes, and psychological evaluation. (DE 91 ¶ 3).

Wilson has a history of special education, seizure disorder, and treatment with psychiatric medication. (DE 74-2 at 16). Dr. Margaret DeLong, Psy.D., completed a psychological evaluation of Wilson on November 20, 2007, which described how Wilson had difficulty controlling her anger, lacked parenting skills, and did not have an adequate support system. (DE 91 ¶ 4). Dr. DeLong recommended that Wilson attend parenting classes and counseling. (DE 91 ¶ 5). Dr. DeLong also recommended that, if Wilson were reunited with Kate, Wilson would require an in-home aide because she would have difficulty caring for Kate independently. (*Id.*).

Over the course of several years, DCPP provided Wilson with evaluations by other psychologists, individual counseling, anger management counseling, assistance with housing, training in parenting skills, and supervised visitation with Kate. (DE 92 ¶ 6). Wilson disputes whether these services were appropriately tailored to her cognitive disabilities, and therefore were not adequately designed to achieve the reunification of Wilson and Kate. (*Id.*)

---

[7]    The parties do not dispute that Donald choked and hit Karen while she was five months pregnant with Kate. (*Id.*). Karen Wilson also told Dr. Brisson and others that Kate was conceived when Donald Wilson raped her while she was sleeping. (DE 70-7 at 7). It appears that Donald and Karen share a surname because they are cousins. (DE 96 ¶ 20). "Wilson," without elaboration, refers to Karen Wilson.

[8]    Throughout this Opinion, I will refer to DYFS and DCPP interchangeably. *See N.J.S.A.* § 9:3A-10(b).

[9]    When Kate was removed from Wilson's care, DCPP was aware that Kate was born in good health and that Wilson was doing well after delivering Kate. (DE 96 at 26; DE 130-1 ¶ 9).

8

Dr. DeLong performed a second evaluation of Wilson in August 2008. (DE 92 ¶ 7). While Dr. DeLong noted some improvement in Wilson's parenting knowledge, Dr. DeLong still expressed concerns about Wilson's expectations from the parent-child relationship, lack of empathy, paranoid and self-defeating personality traits, and lack of trust in others. (*Id.*). Wilson disputes the substance of these findings, asserting that they are inaccurate due to a failure to account for Wilson's cognitive limitations. (*Id.*). Dr. DeLong recommended that DCPP continue to provide the services mentioned above to Wilson. (DE 91 ¶ 8).

In February 2009, Dr. James Battaglia, Ph.D., performed a neuropsychological evaluation of Wilson that revealed an IQ score of 59, which is in the extremely low range of intellectual functioning. (DE 91 ¶ 9). Dr. Battaglia concluded that Wilson had not significantly benefited from the services that DCPP provided to her. (DE 91 ¶ 10). Additionally, Dr. Battaglia concluded that Wilson did not possess a realistic appraisal of what was involved in caring for a child and could not provide the necessary care for Kate. (*Id.*). Wilson does not dispute that these were Dr. Battaglia's findings, but rather contends that the DCPP services did not properly account for Wilson's cognitive limitations and the stress of having a child removed from her care under these circumstances. (*Id.*). Dr. Battaglia recommended that Wilson's parental rights be terminated, which prompted DCPP to institute termination of parental rights proceedings. (DE 91 ¶ 11).

According to the State Appellate Decision, on December 16, 2009, after DCPP proposed a permanency plan of termination of parental rights followed by adoption, the trial judge rejected DCPP's "proposed permanency plan, not because [Wilson] was presently capable of properly parenting Kate, but rather because [DCPP] had not provided [Wilson] with services that would help her 'identify and respond to [her daughter's] special needs.'" 2012 WL 1581252, at *3. The trial judge "also found that the services [DCPP] provided had failed to include 'specialized services tailored to [Wilson's] own needs.'" and "directed

[DCPP] to change its goal to reunification, dismissed the guardianship complaint[,] and reinstated the Division's protective services complaint." *Id.*

Following this directive from the trial court, DCPP retained a licensed psychologist, Dr. Elizabeth M. Smith, to work with Wilson on parenting instructions, which started in January 2010 and continued for approximately every other week through December 2010. (DE 96 ¶ 10). Kate was present during many of those sessions, which, when Kate was present, included an hour of hands-on parenting instruction with Kate and Wilson. (DE 74-3). According to defendant Gillian Batts, a DCPP child protective services worker, the DCPP typically does not offer a doctorate level specialist like Dr. Smith to provide one-on-one training in cases like Wilson's; however, the state court wanted to go "above and beyond the norm" in an effort to aid reunification between Kate and Wilson. (DE 74-8 at 39–41).[10]

By June 2010, Dr. Smith felt that Wilson would not be able to effectively care for Kate by herself and remained concerned about, *inter alia*, "Karen's ability to protect herself or Kate from Mr. Wilson or any other individual who might seek to exploit them." (DE 74-3 at 5). In her June 2010 letter to DYFS, Dr. Smith noted the "considerable literature regarding outcome in children who are raised by developmentally disabled parents" and nonetheless determined that "the only way custody would be feasible is for Karen to have 24 hour support and supervision literally until Kate comes of age." (*Id.* at 6). By December 2010, Dr. Smith concluded that "there is little evidence to indicate that [Wilson] has appreciably benefitted from intervention in terms of her ability to independently parent [Kate]. Given her consistent participation for almost a year and the personality factors described above, it is unlikely that continued efforts in this area will be successful." (DE 96 ¶ 12; DE 74-4).

---

[10]    Batts also testified in her deposition that the DCPP typically aims to achieve permanency of the child within 12 to 15 months from the time that a case comes to the DCPP after the child is removed. (DE 96 ¶¶ 29–30; DE 74-8 at 39–41). However, the DCPP kept working with Wilson for three years in an attempt to achieve reunification, before ultimately seeking adoption. (*Id.*).

In connection with Wilson's family law proceedings, DCPP also retained Dr. Dyer to perform psychological evaluations of Wilson. (DE 91 ¶ 12). Pursuant to his retention, Dr. Dyer evaluated Wilson twice, once in December 2009 and again in February 2011, including observing Wilson with Kate. (*Id.*). He also evaluated Kate's biological father, Donald Wilson, and Kate's foster parents. (*Id.*). Dr. Dyer used many of the tests performed by Wilson's previous evaluators and included additional tests that addressed areas not directly covered during the prior evaluations. (DE 91 ¶ 13). Dr. Dyer's findings were consistent with those of the prior evaluators. (*Id.*). He concluded that, despite the services Wilson had received from DCPP, her prognosis for positive change was poor and recommended that DCPP not consider Wilson as a viable candidate for custody of Kate, instead recommending adoption. (DE 91 ¶ 14).

Specifically, after his December 2009 evaluation of Wilson, Dr. Dyer issued his first report dated March 2, 2010 in which he concluded that Wilson was "functioning well within the mildly retarded range, and that she is particularly impaired in both verbal and nonverbal aspects of intellectual functioning." (DE 96 ¶ 7; DE 74-1 at 9). Dr. Dyer also concluded that Wilson "displays severe emotional problems affecting judgment, impulse control, regulation of mood and emotions, and anticipation of the consequences of actions" and did "not display any insight into her limitations." (DE 74-1 at 18, 19). Additionally, he reported that Wilson had "demonstrated poor compliance with the DYFS case plan, particularly in the area of housing." (*Id.*). Wilson disputes the accuracy of these conclusions, taking issue with whether the testing was appropriate in light of her cognitive limitations. (*Id.* ¶¶ 7, 8).

Dr. Dyer's reports were based on his personal observations during his evaluations and also the written materials provided to him by DCPP about Wilson's case. (DE 91 ¶ 15). Wilson asserts that she has a learning disability and that Dr. Dyer failed to consider this learning disability in performing his evaluations of her. (DE 91 ¶ 17). In response to written discovery requests, Wilson asserts that she was diagnosed with neurological impairment by a

11

doctor at St. Joseph's Hospital in Paterson, New Jersey, around 1979 while she
was in kindergarten, and this disorder was recognized throughout her
schooling. (DE 91 at 13; DE 102-1 ¶¶ 1, 2). Wilson graduated from Passaic
County Technical Vocational High School in Wayne, New Jersey in 1993. (DE
91 at 13; DE 102-1 ¶ 4). She has difficulty reading.[11] (DE 96 ¶¶ 18, 19).

   Dr. Dyer testified during his deposition in this case that Wilson does not
have a learning disability but instead has an intellectual disability, including
below average intelligence as well as other physical and mental concerns. (DE
70-10 at 14; DE 91 ¶ 18; DE 102-1 ¶ 28). Psychologists like Dr. Dyer conduct
evaluations for DCPP and provide recommendations, but the decision to seek
the termination of parental rights rests solely with DCPP, and the decision to
terminate parental rights must then be ordered by a court. (DE 91 ¶¶ 19, 25).

   After Wilson's year of therapy with Dr. Smith starting in January 2010,
Dr. Dyer evaluated Wilson for the second time and issued his second report
dated March 31, 2011. (DE 96 ¶ 13; DE 74-2). Dr. Dyer concluded in this
report that "it continue[d] to be [his] recommendation that [DCPP] not consider
Ms. Wilson as a viable candidate for custody of Kate." (DE 96 ¶ 13; DE 74-2 at
17). Additionally, Dr. Dyer opined that the implications of Wilson's
psychological profile "are extremely negative with respect to parenting capacity"
and that she is "too disorganized psychologically with respect to impulse
control, regulation of mood and emotions, and satisfactory contact with the
demands of day-to-day social reality to be entrusted with the care of any child."
(DE 96 ¶ 16; DE 74-2 at 17). He also noted that Wilson "displayed egregiously
poor compliance with the DYFS case plan, and in fact had harassed her
caseworker to such a degree that a Restraining Order was issued that barred
Ms. Wilson from calling the DYFS office to request to speak to that particular
worker." (DE 74-2 at 16). Moreover, Dr. Dyer concluded that Wilson's
"emotional and behavioral problems are very seriously compounded by her

---

[11]    The parties dispute whether Dr. Dyer incorrectly identified the level at which
Wilson can read. (See DE 96 at 29; DE 103-1 ¶ 22; DE 70-7 at 10).

intellectual limitations, which limit her capacity to profit from services." (DE 96 ¶ 17; DE 74-2 at 17).

In this report Dr. Dyer highlighted two incidents where Wilson supposedly "displayed bizarre behavior": first, Wilson used the bathroom in Dr. Smith's waiting room while the door was open, which made the DYFS transportation aide uncomfortable; second, Wilson disclosed at a group meeting that she knew the foster parents' address and intended to kidnap Kate, dye the child's hair, and then flee from state to state with Kate. (DE 74-2 at 1; DE 96 ¶¶ 14, 15). Dr. Dyer was not present for either of these incidents.

As to the first incident, Wilson contends that Kate pushed the bathroom door open while she was using it and did not leave the door open purposefully. (DE 96 ¶ 14). As to the second incident, Wilson does not recall ever making the statements about fleeing with Kate and dyeing her hair.[12] (DE 96 ¶ 15). Generally, Wilson disputes that Dr. Dyer's report was a proper assessment and counters that it was speculative and lacking evidence of deficits in Wilson's parenting skills. (DE 96 ¶ 13).

Following a two-day trial in 2011, the Superior Court of New Jersey terminated Wilson's parental rights in May 2011,[13] and approved DCPP's plan of foster home adoption of Kate, who was thereafter adopted by her foster parents. (DE 91 ¶ 16; DE 96 ¶ 2; DE 74-7).

For the present case, Wilson obtained an expert report from Nicole Brisson, Ph.D., who is a clinical mental health counselor based in Vermont and is not a licensed psychologist. (DE 70-7; DE 91 ¶ 20). Dr. Brisson's report, dated May 11, 2018, evaluates the techniques of the DCPP-retained

---

[12]  In a response to one of DCPP's interrogatories, Wilson claims that defendants Batts and DaSilva "conspired to fabricate a story that [Wilson] was planning to kidnap her daughter." (DE 92 at 26). However, apart from this interrogatory answer, there is no evidence in the record that supports this allegation of willful fabrication. (DE 103-1 ¶ 17).

[13]  The parties dispute whether the Superior Court issued its order on May 23 or May 25. (DE 96 at 28; DE 103-1 ¶ 19; DE 74-7). This dispute is relevant for the statute of limitations analysis. *See* Subsection III.H., *infra*.

professionals and whether Wilson is competent to care for Kate. (DE 91 ¶ 21; DE 70-7 at 3). Dr. Brisson met with Wilson for a single three-hour interview on March 27, 2018, and at no time did Dr. Brisson meet Kate or observe Wilson and Kate together. (DE 70-7 at 3).

Dr. Brisson determined that the conclusions from Dr. Dyer's evaluations were speculative, lacked substantial evidence, did not adequately employ specialized techniques for a parent with a cognitive disability, and did not consider certain favorable examples of Wilson's ability to handle parenting that Dr. Dyer's own report highlighted. (DE 91 ¶ 22; DE 91 at 28, 31–37). For example, Dr. Brisson cites literature that finds IQ levels to be an inaccurate indicator of competent parenting until the score drops below 50, however Dr. Dyer found Wilson's IQ level to be in the 60s.[14] (DE 91 at 29; DE 96 at 30, 44; DE 103-1 ¶ 29).

Dr. Brisson also takes issue with the diagnostic methods used by Dr. DeLong, asserting that those methods are inapt in the context of individuals with intellectual disabilities and cautioned against in the use of parental rights cases. (DE 91 at 26–27). Specifically, Dr. Brisson wrote that even though the DCPP sought evaluations, it did so "only from professionals they typically employ who provide generic, non-disability informed, psychological evaluations" and that these professionals "did not possess specialized expertise in working with parents with intellectual disabilities and instead specialized in school or clinical psychology." (DE 97 at 62).

With respect to Wilson, Dr. Brisson opined that Wilson had no cognitive deficits that would "endanger[] her child's safety, health[,] or development", that Wilson was willing to provide a safe home for her child, and was not provided the opportunity to demonstrate her ability to parent Kate. (DE 96 at 51).

---

[14]    Dr. Dyer determined that Wilson's full IQ score fell within the low 60s range, which according to his analysis would mean that an adult in that range would be able to function as a co-parent or an ancillary parent but would need a great deal of support from somebody else functioning as the primary caretaker. (DE 70-10 at 18).

Dr. Dyer obtained an expert report by Peter DeNigris, Ph.D., a New Jersey licensed psychologist. (DE 91 ¶ 23; DE 70-8). Dr. DeNigris found that Dr. Dyer was appropriately qualified to perform his evaluations of Wilson and concluded that Dr. Dyer did not conduct his evaluations in an unfair or discriminatory manner. (DE 91 ¶ 24). Dr. DeNigris also made several points to rebut the accuracy of Dr. Brisson's conclusions, including that Dr. Brisson's evaluation was conducted around seven years after the relevant period, that Dr. Brisson lacks the appropriate qualifications, that several of her conclusions were speculative, and that many of her assessments were deficient in light of the fact that she never met Kate or observed Wilson with Kate. (DE 70-8 at 15–19).

Wilson contends that the defendants misrepresented her IQ to the Superior Court of New Jersey because they failed to account for her learning disability when determining her IQ. (DE 91 at 14). She contends that Dr. Dyer misrepresented her ability to read and failed to provide Wilson with an accommodation to take the diagnostic tests in written form, which resulted in a lower test score. (*Id.*). Wilson claims that this caused her to receive a small amount of parenting time and visitation with Kate, which harmed their relationship. (DE 91 at 15). Defendants dispute these contentions, arguing that Dr. Dyer took Wilson's cognitive capabilities into consideration when determining her IQ, that his findings were consistent with her prior evaluations, and that Dr. Dyer never misrepresented Wilson's IQ to any person or entity. (DE 102-1 ¶¶ 9–11).

During Wilson's deposition in this case she was asked how the defendants retaliated against her. (DE 96 ¶ 25). She responded that "they" told her that she could not sue them because they have immunity and would therefore lose whatever lawsuit Wilson brought. (*Id.*; DE 74-5 at 12). Defendant Batts did not recall whether she ever told this to Wilson and was not aware of other case workers making such a statement. (DE 74-8 at 30). Wilson also testified that defendants Lugo, Corain, and Rosario explicitly said "I'm retaliating" against you. (DE 96 ¶ 28; DE 74-5 at 12).

15

Defendant Odelizio Rosario, a DCPP child protective services worker, first became involved in Wilson's family law case when it started in October 2007. (DE 74-6 at 22). Rosario was an intake worker for DYFS at that time and went to St. Joseph's hospital after a social worker at the hospital reached out to DYFS. (*Id.* at 23). Based on the report Rosario reviewed prior to arriving at the hospital, there was an allegation of domestic violence in the home and an allegation that Donald Wilson may be abusing alcohol. (*Id.* at 27).

After arriving at the hospital, Rosario met with the hospital social worker, and then the two of them met with Wilson in her hospital room. (DE 74-6 at 24–25). Rosario informed Wilson that the purpose of the visit was based on an allegation of neglect in the form of physical abuse. (*Id.* at 27). According to Rosario's deposition testimony, Wilson confirmed that there was domestic violence between her and Donald Wilson, and that she was fearful of her father who resided with her and had used violence against Wilson's mother. (*Id.* at 27–28). At this time, Wilson self-disclosed that she had a learning disability and suffered from seizures. (*Id.*).

Wilson testified in her deposition that during this initial meeting Rosario informed Wilson that her learning disability would not be used against her as a basis for DCPP to interfere with her parental rights, but then Kate was removed from her care for this reason. (DE 96 at 26; DE 103-1 ¶ 11). Defendants dispute this and contend that Kate's initial removal was premised on the domestic violence allegations and substance abuse concerns involving Donald Wilson. (DE 103-1 ¶ 11; DE 74-6 at 39). Wilson also contends that she was "heavily medicated" during this initial meeting, but defendants dispute this. (DE 96 at 26; DE 103-1 ¶ 12).

Defendant Gillian Batts first became involved with Wilson's case in September 2010 when it was transferred to the adoption unit and Batts was the assigned adoption case worker. (DE 74-8 at 15). Batts' supervisor was defendant Janet Dasilva. (*Id.* at 15–16).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no

genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### III.   DISCUSSION

#### A. Injunctive Relief

In Counts 1 & 2 plaintiff seeks injunctive relief "in the form of an order requiring that the explicit instruction and policy be made requiring DYFS workers to refrain from abuse of process." (Comp. ¶¶ 59–72). These counts are premised upon purported § 1983 violations of the Fourteenth Amendment for an alleged failure to properly promulgate rules and train those in defendants' command who allegedly committed abuses of process during their investigation and also for a policy or custom of improper hiring and inadequate training that led to alleged abuses of process and deliberate indifference to the rights of persons including Wilson. (*Id.*).

Defendants argue that plaintiff does not have Article III standing to seek such injunctive relief because she has not plausibly alleged that her injury will be redressed by a favorable decision and that she has a likelihood of future injury. (DE 74-9 at 39). In response, plaintiff argues that "[w]ithout injunctive relief, plaintiff will be unable to restore her rights as a parent, and will be unable to become a parent to any children in the future because the State Defendants will remove the child at birth and/or prevent the plaintiff from ever adopting a child." (DE 95 at 37). I agree with defendants that plaintiff does not have Article III standing to seek this injunctive relief. I further find that the injunctive relief plaintiff seeks is vague and unworkable as presented.

Federal courts are courts of limited jurisdiction which are confined to the adjudication of "cases" or "controversies" as permitted by Article III of the Constitution. *See* U.S. Const., Art. III, § 2. The case-or-controversy requirement necessitates that a plaintiff possess constitutional standing. *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). For a plaintiff to have constitutional standing, the following three elements must be present: "the

plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016); *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. 1540, 1547. "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro*, 458 F.3d 181, 188.

Defendants point to *City of Los Angeles v. Lyons*, 461 U.S. 95, 97, 103 S. Ct. 1660, 1662 (1983), where the plaintiff alleged that the officers placed him in a chokehold "without provocation or justification" during a traffic stop. That plaintiff sought a permanent injunction against the City of Los Angeles barring the use of chokeholds except when officers were faced with an immediate threat of deadly force. The Court held that the plaintiff "failed to demonstrate a case or controversy" and that plaintiff's "standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. Specifically, the Court held that even though the plaintiff may have been illegally choked by the police previously, that "does nothing to establish a real and immediate threat that he would again" be illegally choked. *Id.* at 105. In that respect, the plaintiff lacked standing due to the "speculative nature of his claim that he will again experience injury as the result of that practice even if continued." *Id.* at 109.

The same can be said in this case, where Wilson only speculates that she "will be unable to restore her rights as a parent, and will be unable to become a parent to any children in the future because the State Defendants will remove the child at birth and/or prevent the plaintiff from ever adopting a child." (DE 95 at 37). This hypothetical injury is contingent upon Wilson seeking to restore or obtain parental rights anew one day in the future. There is nothing in the

record to indicate that Wilson has presently sought to restore her parental rights in state court.[15]

Given the hypothetical nature of plaintiff's proposed basis for injunctive relief, plaintiff lacks Article III standing. Even assuming for the sake of argument that the defendants acted impermissibly in terminating Wilson's parental rights, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103; *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S. Ct. 669, 676 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects.").

Consequently, I will grant summary judgment in favor of defendants for Counts 1 & 2 and dismiss those claims. *See United States v. Thomas*, 713 F.3d 165, 168 (3d Cir. 2013) ("A judicial decision rendered in the absence of a case or controversy is advisory, and federal courts lack power to render advisory opinions.").

Furthermore, I will separately deny plaintiff's request for injunctive relief on the alternative basis that the injunction plaintiff seeks—an order "requiring DYFS workers to refrain from abuse of process"—is vague and unworkable. To the extent that any state court litigant might claim that DCPP engaged in an abuse of process, the state court system offers a full opportunity for a dissatisfied litigant to raise those issues in both the trial court and on appeal.[16]

---

[15]    To the extent that she seeks to invalidate her prior termination of parental rights in this federal case, such efforts would independently be barred due to a lack of federal subject matter jurisdiction. *See Gochin v. Haaz*, 724 F. App'x 155, 158 (3d Cir. 2018) ("[T]o the extent that [plaintiff] sought to appeal any previous unfavorable state court rulings through this federal litigation, the District Court lacked subject matter jurisdiction to consider that relief." (citing *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010), for the standards and application of the *Rooker-Feldman* doctrine)).

[16]    It is worth noting that it is already impermissible to engage in an abuse of process. *Dunne v. Twp. of Springfield*, 500 F. App'x 136, 139 (3d Cir. 2012) ("[T]he gravamen of a malicious abuse of process claim is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse

The entry of such an order here would almost certainly result in a flurry of federal suits that the rulings in state court family law matters ignored or circumvented the federal order, with likely clarifications sought regarding the putative prohibition of an "abuse of process" and reconsideration of the state court's decision.

The U.S. Supreme Court has made clear that such a scenario is neither permissible nor desirable. In *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974), the Court explained that federal courts should not enter orders "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future" state court proceedings. *Id.* at 678. In short, a federal district court is not to appoint itself a *de facto* supervisor of state court proceedings, or an alternative court of appeal, a scenario which would inevitably ensue given the frequent interplay between the New Jersey state courts and the DCPP regarding family law matters.

A federal order that "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance" with the order would be an impermissible "ongoing federal audit" of the state proceedings that would require a district court "to sit in constant day-to-day supervision" of state court judges. *O'Shea*, 414 U.S. at 501 (noting that an order of this type "would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim ab initio"). "A federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." *Id.* at 501; *see also Hagberg v. New Jersey*, 751 F. App'x 281, 287 (3d Cir. 2018) (noting that "it is not the job of the federal court

---

of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." (internal quotations and citations omitted)); *DiPietro v. New Jersey Family Support Payment Ctr.*, No. 08-4761, 2009 WL 1635568, at *7 (D.N.J. June 10, 2009), *aff'd*, 375 F. App'x 202 (3d Cir. 2010); *Emolo v. McDaniel*, No. A-0974-08T1, 2009 WL 2243792, at *4 (N.J. Super. Ct. App. Div. July 29, 2009).

Furthermore, abuses of process can take many forms and a vague, blanket order prohibiting all abuses of process would provide little guidance to defendants Wood and Blake at such a high level of generality.

to sit in constant supervision of the New Jersey family court, which would essentially 'transform federal courts into family courts.'" (quoting *Brittain v. Hansen*, 451 F.3d 982, 995 (9th Cir. 2006)).

Consequently, as an alternative ground for dismissal, I find that the injunctive relief plaintiffs seek in Counts 1 & 2 is vague and unworkable.[17]

### B. 42 U.S.C. § 1985 – Conspiracy

In Count 3, plaintiff alleges that the defendants "reached a meeting of the minds" to tolerate abuses of process in an effort to deny Wilson of her rights to due process. (Comp. ¶¶ 73–76). The defendants argue that the facts developed in discovery do not support plaintiff's claim for conspiracy under § 1985(3). (DE 69-5 at 28; DE 74-9 at 51). I agree with defendants and will grant summary judgment on this claim.

A plaintiff can bring an action under § 1985(3) for an injury caused by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To make out a violation of § 1985(3) a plaintiff must prove the following four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (internal citation and quotation omitted). "[A] plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." *Id.* at 135.

---

[17]   Given this dismissal of Counts 1 & 2, and the dismissal of the ADA claim in Count 7 against the official capacity defendants, *see* Subsection III.E.1., *infra*, I do not reach the arguments of defendants Wood and Blake regarding legislative immunity. (DE 95 at 38–42).

Initially, I note that the U.S. Court of Appeals for the Third Circuit has recognized that discrimination based on mental disability "often rests on immutable characteristics which have no relationship to ability" and thus constitutes a qualifying class under § 1985(3). *Lake v. Arnold*, 112 F.3d 682, 687 (3d Cir. 1997), *as amended* (May 15, 1997); *Farber*, 440 F.3d at 138. I agree with this analysis and recognize that certain mentally disabled individuals can assert a claim under § 1985(3).

Nevertheless, plaintiff has failed to put forward facts to support the first element of such a claim—*i.e.*, the existence of a conspiracy. "The conspiracy element of § 1985(3) requires a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon, and an overt act that results in that damage." *Russo v. Voorhees Twp.*, 403 F. Supp. 2d 352, 359 (D.N.J. 2005) (internal citation and quotations omitted).

There is nothing in the record to indicate an agreement or "meeting of the minds" among any of the defendants to deprive Wilson of her constitutional rights. The complaint has not alleged, and the facts established through discovery have not evinced, any specific details about when, how, or why the defendants formed a supposed agreement to violate Wilson's rights. Indeed, plaintiff's brief merely states in conclusory terms that a conspiracy existed, without pointing to any particular facts supporting such an agreement among the defendants, beyond self-servingly citing to her own response to an interrogatory. (DE 95 at 44–45). Moreover, review of that interrogatory response only reveals more conclusory allegations of a conspiracy that are devoid of supporting facts. (*See* DE 97 at 20–22, Ans. 2).

Without specific facts supporting some type of agreement among any of the defendants to violate plaintiff's rights, a reasonable jury could not find for Wilson on this claim. *See Russo*, 403 F. Supp. 2d at 359 (granting defendants' summary judgment motion on § 1985(3) claim because plaintiff was unable to

adduce facts showing an agreement between the defendants and noting that "[a]n agreement is a necessary component of a conspiracy."); *see also Twombly*, 550 U.S. at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99 (1971) (noting that § 1985(3) requires proof that conspirators sought to deprive a person of equal protection of the laws).

While it is true that circumstantial evidence may suffice to establish a civil rights conspiracy, *Marable v. W. Pottsgrove Twp.*, 176 F. App'x 275, 282 (3d Cir. 2006), the record lacks even the necessary circumstantial evidence to survive summary judgment on this basis. I will therefore grant defendants' motion for summary judgment on the conspiracy claim in Count 3.

### C. Plaintiff's Fourth, Fifth, Sixth, and Eighth Amendment Claims

Counts 4 through 6 allege violations under the Fourth, Fifth, Sixth, and Eighth Amendments of the U.S. Constitution, among others. (Comp. ¶¶ 77–103). Defendants are entitled to summary judgment on all of these claims because the plaintiff does not specify how these amendments are applicable and has not put forward any evidence to support them.

Defendants accurately point out the following with respect to these counts (DE 74-9 at 44–45):

(1) Plaintiff incorrectly quotes from either the Fifth or Fourteenth Amendment when citing to the Fourth Amendment in her complaint and does not otherwise explain how the Fourth Amendment would apply in this case.

(2) The due process clause in the Fifth Amendment applies to actions of the federal government. *B & G Const. Co. v. Dir., Office of Workers' Comp. Programs*, 662 F.3d 233, 246 n. 14 (3d Cir. 2011). Plaintiff does not explain how any of the defendants could be part of the federal

24

government or sued as representatives of the federal government
(none are federal employees or otherwise affiliated with a federal
agency).

(3) The Sixth Amendment, which typically applies to criminal defendants,
is not implicated in this case and plaintiff has failed to establish its
relevance here.

(4) The Eighth Amendment confers the right to be free from cruel and
unusual punishment. It applies "primarily, and perhaps exclusively,
to criminal prosecutions and punishments." *Browning-Ferris Indus. of
Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 262, 109 S. Ct.
2909, 2913 (1989). Plaintiff has not established its relevance or
supported this claim with any evidence or analysis.

Plaintiff did not respond to any of these points in her opposition brief and
failed to otherwise advance any argument in support of them. (*See generally*
DE 95; DE 103 at 19). Accordingly, I will dismiss these claims insofar as they
are based on the Fourth, Fifth, Sixth, and Eight Amendments.[18]

### D. Plaintiff's First Amendment Retaliation Claim

In Counts 5 & 6, plaintiff asserts a claim of First Amendment retaliation
pursuant to 42 U.S.C. § 1983. (Comp. ¶¶ 84–103). Those allegations broadly
assert that Wilson "made complaints about DYFS's conduct" and thereafter
"the defendants" retaliated against her by terminating her parental rights on
the basis of those complaints. (*Id.* ¶ 95).

In order to support a retaliation claim under the First Amendment, a
plaintiff must show: "(1) constitutionally protected conduct, (2) retaliatory
action sufficient to deter a person of ordinary firmness from exercising his [or
her] constitutional rights, and (3) a causal link between the constitutionally

---

[18]    Plaintiff's counsel should be mindful of the costs of the highly disfavored
practice of "shotgun pleading." *See generally Bartol v. Barrowclough*, 251 F. Supp. 3d
855, 858 (E.D. Pa. 2017).

protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

It must be said that the plaintiff is not very specific about what complaints she made, to whom, and when. Still, I will find that plaintiff has satisfied the first element insofar as complaining to the state about her grievances with the state's actions in connection to her family law matter is constitutionally protected conduct. *See Robinson v. Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006) (noting that prisoner filing grievance against corrections officer was constitutionally protected conduct for purposes of First Amendment retaliation claim).

The second element, at least with respect to Rosario, is conceded by defendants. (DE 74-9 at 47–48). A termination of parental rights (assuming *arguendo* that it was retaliatory, of course) would surely deter a person from asserting such a grievance.

It is with respect to the third element of the retaliation claim—*i.e.,* a causal link between the state's action in terminating Wilson's parental rights and the constitutionally protected conduct of Wilson's complaining to state officials about their actions—that this claim falls short. The only evidence in the record of a causal, retaliatory link is plaintiff's deposition testimony. There, she stated that defendants Lugo, Corain, and Rosario, did not like the fact that Wilson was complaining, told her verbatim, "I'm retaliating," told her that they had immunity from suit, and terminated her parental rights on the basis of her complaints. (DE 74-5 at 12). Plaintiff's opposition brief does little to add content to these assertions and merely states in conclusory terms that "[t]he retaliatory actions of Rosario led to Plaintiff's parental rights being terminated in an effort to chill Plaintiff's rights under the First Amendment and to discourage Plaintiff from asserting her civil rights claims against Rosario."[19] (DE 95 at 42–44).

---

[19]    Plaintiff's opposition brief also makes the bald accusation that unnamed defendants "fabricat[ed]" allegations that Wilson said she was going to "kidnap" her child from DCPP custody and intentionally did not provide Wilson with "services

26

It was the Superior Court of New Jersey, however—not defendants Lugo, Corain, or Rosario—that terminated Wilson's parental rights in May 2011, following a two-day trial where Wilson was able to present evidence. (DE 91 ¶ 16; DE 96 ¶ 2; DE 74-7). There is no indication that the Superior Court judge was even aware of Wilson's complaints. The judge cannot be said to have ordered the termination of Wilson's parental rights on the basis of those complaints. "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). *A fortiori,* defendants may defeat the claim by demonstrating that someone else took the same action, on the basis of an independent evidentiary record.

Even if some combination of Lugo, Corain, or Rosario told Wilson they were out to get her or could not be sued, it is difficult to see how that conversation would have influenced the state trial court judge's decision to terminate Wilson's parental rights. As the State Appellate Decision noted regarding the trial court's analysis, "the evidence amply satisfied the statutory standard for termination of parental rights." State Appellate Decision, No. A–5416–10T2, 2012 WL 1581252, *cert. denied*, 212 N.J. 199, 52 A.3d 177 (2012). Consequently, whether or not Wilson made these complaints to Lugo, Corain, and Rosario, the state trial court would have taken the same action.

Lacking sufficient direct evidence to establish a causal link, a plaintiff may rely on circumstantial evidence to show a retaliatory motive to support the causation element. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). A plaintiff can make such a showing with evidence of either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that

---

required under the Americans with Disabilities Act" due to her complaints. I do not credit these vague accusations of willful distortion of the truth, which are not supported by citations to the record and have no evidentiary support. (DE 95 at 42–44).

suggests a causal link." *Id.* Here, plaintiff has not shown either a temporal proximity or a pattern of antagonism coupled with timing. For starters, plaintiff does not specify when she made her complaints, so the temporal proximity argument has no starting point. Moreover, where the timing alone is not "unusually suggestive" of retaliatory motive, the plaintiff must set forth other evidence to establish a causal link. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

Here, too, the claim runs up against the fact that the relevant decision maker was the state trial judge. The state trial court judge had the benefit of three years of evaluations by mental health professionals, including one-on-one regular sessions with Dr. Smith, a doctoral level specialist, that lasted nearly a year. Rather than suggesting a pattern of antagonism, the record indicates a continued effort by the state court trial judge (and defendants) to accommodate Wilson's intellectual limits. For example, the DCPP provided Wilson with individual counseling, anger management counseling, assistance with housing, training in parenting skills, and supervised visitation with Kate. (*see* DE 70-8 at 14). Moreover, after two years of these efforts, in December 2009 when DCPP sought termination of Wilson's parental rights, the trial court judge rejected DCPP's proposal and ordered DCPP to provide specialized services tailored specifically to Wilson's limitations with the goal of reunification. Those specialized services continued for another year and a half before the trial court terminated Wilson's parental rights in May 2011.

Consequently, plaintiff has not established a causal link between her complaints to the defendants and the ultimate termination of her parental rights. I will therefore grant summary judgment in favor of defendants on plaintiff's First Amendment retaliation claim.

### E. Americans With Disabilities Act Claim

In Count 7, plaintiff asserts that certain defendants violated her rights under Title II of the ADA by not providing her with specialized services tailored to her mental limitations and by using her disability as a basis to deprive her of her parental rights. (Comp. ¶¶ 104–109). Because the official-capacity

defendants enjoy sovereign immunity from this claim and the individual capacity defendants are not subject to suit under Title II of the ADA, I will grant summary judgment in favor of defendants on Count 7.

## 1. Sovereign Immunity

The Eleventh Amendment to the Constitution, which is of jurisdictional stature, renders the States immune from certain claims in federal court: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amend. XI. Despite the limited scope of its wording, the Eleventh Amendment has for over a century been held to incorporate a more general principle of sovereign immunity. In general, it bars citizens from bringing suits for damages against any state in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *Kelley v. Edison Twp.*, No. 03–4817, 2006 WL 1084217, at *6 (D.N.J. Apr. 25, 2006) (citing *Bennett v. City of Atl. City*, 288 F. Supp. 2d 675, 679 (D.N.J. 2003)); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).

"Although the language of the Eleventh Amendment refers only to 'States,' the Supreme Court has held that the immunity extends to entities that are considered arms of the state." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 545 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007); *Garden State Elec. Inspection Servs. Inc. v. Levin*, 144 F. App'x. 247, 250 (3d Cir. 2005) ("Eleventh Amendment immunity extends to the state's agencies or departments, provided that the state is the real party interest."). To determine whether an entity is an arm of the state for Eleventh Amendment purposes, the Third Circuit applies the following three-part test: "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Id.* at 546.

Here, defendants convincingly argue that DCPP is an arm of the state. (DE 74-9 at 21). The Department of Children and Families ("DCF") is a "principal department" that was "established in the Executive Branch of the State Government," N.J. Stat. Ann. § 9:3A-3, and DCPP is New Jersey's child protection and welfare agency within DCF. N.J. Stat. Ann. § 9:3A-9. Like other courts in this District, I find that DCCP is an arm of the state for purposes of the sovereign immunity analysis. *See, e.g., Sweet-Springs v. Dep't of Children & Families*, No. 12-706 FLW, 2013 WL 3043644, at *5 (D.N.J. June 17, 2013) ("Courts in this district have long held that DCF and DYFS are, beyond dispute, arms of the state for sovereign immunity purposes. . . the State of New Jersey is the real party-in-interest."); *Doe v. Div. of Youth & Family Servs.*, 148 F. Supp. 2d 462, 491 (D.N.J. 2001); *Simmerman v. Corino*, 804 F. Supp. 644, 650 (D.N.J. 1992), *aff'd*, 16 F.3d 405 (3d Cir. 1993).

The Eleventh Amendment bar on actions against States in federal court "remains in effect when State officials are sued for damages in their official capacity." *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 3107 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S. Ct. 900, 908 (1984). Therefore, defendants Blake and Wood, who are sued in their official capacities, are on an equal footing with DCPP for purposes of sovereign immunity.

The U.S. Supreme Court, in *United States v. Georgia*, 546 U.S. 151, 153, 126 S. Ct. 877, 878 (2006), considered whether Congress has abrogated Eleventh Amendment sovereign immunity with respect to Title II of the ADA. The Court concluded that "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159. To make that determination, the Court established the following test, which requires courts to determine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct

30

violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 159.

The Third Circuit has applied *Georgia* to require District Courts "to determine in the first instance if any aspect of the [ ] alleged conduct forms the basis for a Title II claim." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007). The second and third aspects require the District Court to "determine whether the alleged conduct also violates the Fourteenth Amendment, and if not, whether Congress's purported abrogation of state sovereign immunity is nevertheless valid." *Baxter v. Pennsylvania Dep't of Corr.*, 661 F. App'x 754, 756 (3d Cir. 2016) (citing *Bowers*, 475 F.3d at 553–54). However, it is not necessary to reach the constitutional issue "unless and until it is decided that the plaintiff has made out a valid Title II claim." *Id.* (citing *Georgia*, 546 U.S. at 159; *Bowers*, 475 F.3d at 553).

In this case, plaintiff has failed to establish a valid Title II ADA claim. Under Title II, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To show a violation of Title II, a plaintiff must establish: (1) she is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) because of her disability. *Bowers*, 475 F.3d at 553 n. 32.

Here, defendants concede that Wilson is a qualified individual with a disability but contend that she was not denied services or subjected to discrimination because of her disability. (DE 74-9 at 24). Wilson argues that the state defendants discriminated against her by terminating her parental rights based upon testing and services that did not sufficiently accommodate

31

her disability. (DE 95 at 11). I agree with defendants that the record would not allow a reasonable jury to find that Wilson was denied services or discriminated against because of her disability.

In New Jersey family court proceedings that involve questions of custody, the guiding standard is the best interests of the child. *New Jersey Div. of Youth & Family Servs. v. A.G.*, 344 N.J. Super. 418, 442, 782 A.2d 458, 473 (App. Div. 2001). In *A.G.*, a "mentally disabled" parent argued that "the failure to provide her with a reasonable opportunity to reunite with the child equates to discrimination against the mentally challenged" under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* § 10:5–1 *et seq.*, because the mother was "entitled to a reasonable accommodation of her disability by providing her additional time and opportunity to try to bond with the child." *Id.* at 441. The court held that "reliance upon the LAD is misplaced in the context of a termination of parental rights case" because "the best interests of the child is the guiding principle in determining whether parental rights should be terminated" and "[r]eliance upon the LAD would change the focus of the termination case from the best interests of the child to the rights of the parent." *Id.* at 441.

The *A.G.* court did not identify any case that directly addressed this issue under the LAD, but noted that the issue had been raised several times under the ADA, where the "majority of courts that have considered the issue have concluded that the ADA does not provide a defense to a termination of parental rights proceeding." *Id.* at 442 (collecting cases). The court then determined that DYFS made reasonable efforts under the circumstances to accommodate the mother's disabilities through "the Division's efforts to provide services to help the parents correct the circumstances which led to [the child's] placement outside the home and [by] consider[ing] the alternatives to termination of her parental rights", even though "those efforts did not bear fruit." *Id.* at 442. While *A.G.* considered these issues in the context of an affirmative defense to the termination of parental rights, its principles are applicable here.

32

For purposes of summary judgment, it is important to note that there is no factual dispute as to what efforts the DCPP undertook. The dispute posed is one of interpretation—*i.e.*, whether these constituted reasonable efforts under the circumstances to accommodate Wilson's disabilities by providing her with individual counseling, anger management counseling, assistance with housing, training in parenting skills, and supervised visitation with Kate. (DE 70-8 at 14). This course of conduct took place over the course of more than three years, much longer than a typical parental rights case, and included one-on-one coaching in parenting skills with a doctorate level specialist, which itself is atypical. Indeed, Dr. Smith was retained to meet with Wilson on a regular basis for individual coaching in parenting skills after the state trial court specifically directed DCPP to tailor its efforts to reunification in light of Wilson's cognitive limitations. While Wilson attempts to challenge whether these additional steps appropriately considered her intellectual disability. However, these extra measures were taken as a result of her disability and in that way were premised upon accommodating her limitations. *See A.G.*, 344 N.J. Super. at 442 ("The Division's efforts in providing classes and parenting programs must by their very nature take into consideration the abilities and mental conditions of the parents."). Consequently, she cannot be said to have been deprived of services due to disability; indeed she was provided with additional services as a way of accommodating her disability.

To be clear, a mental disability is not in itself a basis to terminate parental rights. However, state courts that must determine parental rights based on the best interests of the child standard can take a holistic view of the circumstances that are relevant to a parent's ability to raise a child. In that respect, a parent's intellectual limitations can be "a factor considered by the court, but only to the extent that the disability affected the child in a detrimental way." *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 254, 947 S.W.2d 761, 767 (1997); *New Jersey Div. of Youth & Family Servs. v. C.F.*, No. A-5276-11T1, 2014 WL 349576, at *4 (N.J. Super. Ct. App. Div. Feb. 3, 2014) ("Where a direct causal link exists between a parent's mental illness and

33

neglect of his or her children, a failure to exercise the requisite degree of minimum care may be found."); *see also In re B.S.*, 166 Vt. 345, 352, 693 A.2d 716, 720 (1997) ("Mental retardation is not, by itself, a ground for terminating parental rights. In deciding whether to terminate parental rights, the court must determine the best interests of the child in accordance with" the statutory criteria under Vermont law.); *In re Angel B.*, 659 A.2d 277, 279 (Me. 1995) (noting that mentally disabled plaintiff did not demonstrate that state agency "failed to offer her certain services or that it offered her services that were not as effective in affording her equal opportunity to rehabilitate and reunify with her children *on the basis of her disability*.").

In this case, the multiple mental health professionals took into account Wilson's cognitive limits in reference to her ability to parent Kate. In that regard, the recommendations and evaluations were not based on her disability as such, but were tied to her fitness and ability to adequately parent a disabled child.[20]

---

[20]    *See* March 2010 Dr. Dyer Report (DE 74-1 at 3 ("The specific referral questions addressed in the present report include assessment of the current intellectual and personality functioning of Donald and Karen Wilson, particularly with respect to parenting capacity, alcohol/substance abuse issues, and risk, if any, to [Kate] if she were placed in the custody of either separately or both jointly."); DE 74-1 at 18 (Wilson "displays severe emotional problems affecting judgment, impulse control, regulation of mood and emotions, and anticipation of the consequences of actions."); DE 74-1 at 19 ("Ms. Wilson does not have the intellectual capacity to provide adequate nurturance, physical protection, material comforts, stimulation, and structure to a young child. This is a separate and distinct factor that complicates the subject's personality problems.")); March 2011 Dr. Dyer Report (DE 74-2 at 1 ("In spite of [the individual coaching in parenting skills with Dr. Smith], Ms. Wilson fails to interact with the child appropriately, exercise proper vigilance, or take proper safety precautions in supervising [Kate]."); DE 74-2 at 17 ("The implications of the above psychological profile are extremely negative with respect to parenting capacity."); *id.* (Wilson "lacks the capacity for vigilant supervision of a young child, rationally oriented mature judgment, impulse control, and regulation of emotions in order to provide a consistently safe, structured, nurturing, and appropriately stimulating environment."); *id.* ("With respect to the developmental delays and special needs that [Kate] presents, this child will need an even greater level of competence and vigilance on the part of a caretaker then would be the case with a normally endowed child."); *id.* ("Ms. Wilson's emotional and behavior problems are very seriously compounded by her intellectual limitations, which limit her capacity to profit from services.")); June 2010 Dr. Smith Letter (DE 74-3 at 3 ("I reiterate my concerns about [Wilson's] ability to understand

The record reflects several reasons apart from Wilson's mental limitations that would support the state trial and appellate courts' determination that the evidence "amply satisfied the statutory standard for termination of parental rights." State Appellate Decision, 2012 WL 1581252 at *1. As Dr. Smith noted in her June 2010 letter, Kate "is especially at risk as Karen does not have a stable family or any appropriate networks" apart from the professional services she received from DCPP during its reunification efforts. (DE 74-3). Several of the retained professionals and DCPP employees noted the cause for concern regarding Donald Wilson's alcohol abuse and history of domestic violence allegations. DCPP was also aware of other domestic violence allegations against Karen Wilson's father, with whom Wilson lived when Kate was removed from her custody. See C.F., 2014 WL 349576, at *5 (noting that "the mere existence of [the mother's] mental illness and her occasional noncompliance gave rise to the possibility of some risk" but there was no substantial risk of abuse or neglect because the mother had "the benefit of living with the father of the child and her parents, who" were able to compensate for the mother's disability.). Moreover, many of the retained professionals noted the extra level of care required to parent a disabled child such as Kate as well as Wilson's difficulties with anger management and anxiety. (DE 74-1 at 5; DE 74-1 at 19 ("Ms. Wilson does not demonstrate any significant appreciation of her [child's] developmental delays."); DE 74-2 at 2). These considerations, as well as others, were part of the totality of circumstances that DCPP assessed in making its parental rights recommendation.[21]

---

[Kate's] medical and academic needs and to make decisions regarding them.")); December 2010 Dr. Smith Letter (DE 74-4 at 4 ("[T]here is little evidence to indicate that [Wilson] has appreciably benefitted from intervention in terms of her ability to independently parent [Kate]. . . . it is unlikely that continued efforts in this area will be successful.")).

[21]    I use the term "recommendation" advisedly. The DCPP is only able to initiate the termination of parental rights proceedings. It is ultimately the state trial court that makes the determination whether to order the termination of parental rights. Wilson had the opportunity to make her case to the state trial court judge during a two-day

Defendants cite to their own expert report, issued by Dr. Brisson, to undermine the conclusions and methods of the numerous DCPP-retained mental health professionals. The Brisson report, however, must be viewed in the appropriate context. Dr. Brisson met with Wilson on a single occasion for three hours. Kate was not present for this meeting; Dr. Brisson did not have a firsthand factual basis for an opinion regarding Wilson's interaction with Kate. In contrast, Dr. Smith met with Wilson every other week for nearly a year and many of those sessions included Wilson interacting with Kate. For both his March 2010 report and March 2011 report, Dr. Dyer conducted individual psychological examinations of Karen Wilson and Donald Wilson, and separate bonding assessments of Kate with Karen and Donald. (DE 74-1 at 1; DE 74-2 at 1). Moreover, as defendants point out, Dr. Brisson is not a licensed psychologist and her assessment of Wilson's current capacities in 2018 has only limited value when appraising the conclusions from 2007 through 2011. (DE 69-5 at 34; DE 70-8 at 15–19).

Given the limitations of Dr. Brisson's report, her conclusions do not create an issue of fact as to whether Wilson was discriminated against or denied services based on her disability. Specifically, Dr. Brisson's 2018 conclusion that "[t]here is no discernible reason that Ms. Wilson's alleged cognitive deficits or mental health problems would necessarily have endangered her child's safety, health, and development" at best establishes a difference of opinion, if that. It does not erase the State's legitimate basis for acting as it did. It does not establish that the State discriminated, or even erred, when it opted to rely on the evidence available to it: the consistent and persuasive conclusions of Dr. DeLong, Dr. Battaglia, Dr. Smith, and Dr. Dyer, who met with and evaluated Wilson for dozens of hours over the course of several years. (DE 70-7 at 33).

_____

adversarial trial where she was permitted to present evidence, cross examine witnesses, and appeal that decision.

Plaintiff cites to *Bartell v. Lohiser*, 215 F.3d 550, 558 (6th Cir. 2000), for the proposition that an IQ test alone is insufficient to measure the kind of intelligence that is necessary to raise a child. (DE 95 at 13). Few would disagree. Nevertheless, the Sixth Circuit affirmed the dismissal of the plaintiff's substantive due process claim based on other factors, such as the plaintiff's history of abuse and "ultimate inability to control a child who presents unique behavioral and psychological challenges." *Bartell*, 215 F.3d at 558 ("While critical thinking and reasoning skills are undoubtedly relevant, at some level, to the ability of a parent to raise her child, the State must make a specific and tangible showing, not a presumptive one, on the precise nature of the links between these capacities and a particular child's needs.").

Wilson argues that her case is distinguishable from *Bartell* because she did not have a history of abuse with her child. However, in this case, as in *Bartell*, the DCPP-retained mental health professionals based their assessment on a comprehensive view of Wilson's inability to effectively parent Kate, including factors such as Wilson's lack of a family support network, risk of domestic violence from Donald Wilson and Wilson's father, Wilson's anger management and anxiety issues, and the extra attention required to care for a disabled child. Several of the DCPP-retained mental health professionals expressed concern with Wilson's intellectual limits but those concerns were expressed in reference to Wilson's ability to care for a disabled child. Consequently, the defendants have shown an empirical basis for Wilson's inability to adequately parent under the circumstances. They did not run afoul of the rule that such a determination cannot be made solely on the basis of an IQ test. *See Bartell*, 215 F.3d at 559 ("To the extent that a parent's intelligence level may legitimately inform a State's assessment of whether parental rights may be terminated, the Constitution at least requires the State to establish empirically that the kinds of intelligence most necessary to caring for a particular child are deficient in that parent.").

As to the plaintiff's ADA claim, the *Bartell* court held that the plaintiff failed to raise a genuine issue of material fact as to whether she was denied custody or denied any accommodations because of her disability. *Bartell*, 215 F.3d at 560. With respect to the ADA claim, the court held that the defendants and the probate court "relied on wide-ranging evidence pertaining to Bartell's conduct, behavior, and history of abuse in terminating her parental rights" and noted that prior to the termination decision the defendants "attempted to equip her with the skills necessary to care for [the child] by providing parental aides, parental classes, and psychological therapy." *Id.* at 560.

The same analysis is applicable here. It is undisputed that the defendants and the state court possessed and relied on a wide range of evidence regarding Wilson, and that DCPP attempted to equip Wilson with the skills necessary to care for Kate by providing various services tailored to her needs. (*see, e.g.,* DE 70-8 at 14). As in *Bartell*, these additional steps—the existence if not the significance of which was substantially undisputed—amounted to a reasonable accommodation under the circumstances.

The first prong of the *Georgia* immunity analysis is whether the plaintiff has established a valid Title II claim under the ADA. For the reasons expressed above, I find that she has not. I therefore do not reach the second and third prongs (whether there is an independent Fourteenth Amendment violation, and the scope of the legislative abrogation of immunity). Because these claims fail the first prong of the *Georgia* analysis, the official state defendants—DCPP, Wood, and Blake—enjoy sovereign immunity on Wilson's ADA claim. *See Georgia*, 546 U.S. at 159; *Bowers*, 475 F.3d at 553. I will grant summary judgment in favor of these official state defendants on Count 7.

### 2. Individual-Capacity Defendants

The individual-capacity defendants—Rosario, Batts, and Dasilva—argue that they are not subject to suit under Title II of the ADA because defendants who are not public entities or who are not sued in their official capacities cannot be liable for Title II violations. (DE 74-9 at 33). Plaintiff tacitly concedes

this point by not responding to it in her opposition. (*See generally* DE 95; DE 103 at 9).

> Liability under Title II of the ADA is confined to public entities:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a *public entity*, or be subjected to discrimination by any *such entity*.

*See* 42 U.S.C. § 12132 (emphasis added). *See also* 42 U.S.C. § 12131(1) (defining "public entity" as "(a) any State or local government; (b) any department, agency, special purpose district, or other instrumentality of a State or local government; and (c) the National Railroad Passenger Corporation, and any other commuter authority"); *Bowens v. Wetzel*, 674 F. App'x 133, 136 (3d Cir. 2017); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999).

Consequently, I will grant summary judgment in favor of Rosario, Batts, and Dasilva with respect to the ADA claim in Count 7. For the same reasons described in this subsection, I will necessarily dismiss Count 7 against other defendants sued in their individual (as opposed to official) capacities, including defendants Corain, Depretents, Lugo, and Dr. Dyer.

### F. Fourteenth Amendment Claims

In Counts 4 & 5, plaintiff asserts a violation of her due process and equal protection rights under the Fourteenth Amendment. (Comp. ¶¶ 77–93). Defendants argue that plaintiff has failed to establish a claim under the Fourteenth Amendment. (DE 74-9 at 26–30). I agree with defendants and will dismiss plaintiff's Fourteenth Amendment claims.

The complaint includes only conclusory allegations as to a Fourteenth Amendment violation and lacks specific details as to the nature of the alleged violation. (*See* Comp. ¶¶ 77–93). The development of the factual record through discovery and plaintiff's opposition briefing has not clarified or added support to those allegations.

The Due Process Clause of the Fourteenth Amendment has both a procedural and substantive component.

To establish a procedural due process claim a plaintiff must establish that "(1) he [or she] was deprived of a liberty interest encompassed within the Fourteenth Amendment and (2) the procedures used did not provide due process of law." *Santos v. Sec'y of D.H.S.*, 532 F. App'x 29, 33 (3d Cir. 2013). Putting aside the first element, the plaintiff has not adequately alleged or established that the procedures used during her family law proceedings did not comport with due process standards.

Plaintiff engaged in extensive custody proceedings before the Superior Court that included multiple court appearances, the opportunity to present and rebut evidence during a two-day trial, and the chance to appeal the Superior Court's decision, which resulted in a reasoned, written opinion from the Appellate Division. *See* State Appellate Decision, 2012 WL 1581252. Additionally, when DCPP first sought to terminate Wilson's parental rights, the Superior Court directed DCPP to engage in further reunification efforts in a way that was targeted towards Wilson's intellectual limitations. This directive resulted in more than a year of additional DCPP services including regular individual coaching sessions in parenting skills with a doctorate level mental health professional. Plaintiff has failed to put forward any allegations or facts that would establish a procedural due process violation.

To comply with substantive due process, a State must satisfy a clear-and-convincing standard of proof when terminating parental rights. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 1403 (1982); *Hagberg v. New Jersey*, 751 F. App'x 281, 286 (3d Cir. 2018). With respect to a New Jersey custody proceeding in particular, a substantive due process claim requires proof that there was not clear and convincing evidence to satisfy the best interest of the child factors set forth in N.J. Stat. Ann. § 30:4C-15.1(a). *New Jersey Div. of Youth & Family Servs. v. F.M.*, 211 N.J. 420, 447, 48 A.3d 1075, 1090 (2012).

40

Those N.J. Stat. Ann. § 30:4C-15.1(a) factors are as follows: (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship; (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his or her resource family parents would cause serious and enduring emotional or psychological harm to the child; (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and (4) Termination of parental rights will not do more harm than good. *F.M.*, 211 N.J. at 448.

Nowhere in the complaint does plaintiff directly allege that the Section 30:4C-15.1(a) factors were not satisfied by clear and convincing evidence. Plaintiff's briefing generally sets out the constitutional right of parents to raise their children but does not grapple with the best interest of the child standard. (DE 95 at 31–33). Rather, plaintiff reiterates her factual argument under the ADA and asserts in conclusory fashion that this constitutes a due process violation as well. (*See, e.g.,* Plaintiff's Opposition, DE 95 at 33 (arguing that DCPP "obtained the judgment terminating Plaintiff's parental rights through a violation of her due process and a violation of the ADA by unlawfully discriminating against Plaintiff based upon her disability in both the diagnostics and purported services that were provided to the Plaintiff.")). Insofar as this argument can be construed as addressing the third Section 30:4C-15.1(a) factor, I have already held that DCPP made reasonable efforts to provide Wilson with services to help correct the circumstances which led to Kate's placement outside of the home. *See* Subsection III.E.1., *supra*. With that analysis in mind, I hold that the plaintiff has not satisfied her burden of showing that the state's custody determination failed to meet the clear and convincing evidence standard.

41

With respect to the Equal Protection Clause, "[t]o prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010) (internal quotation and citation omitted). Plaintiff has neither alleged nor established through discovery that other persons were similarly situated, or that she was treated differently from them. She has therefore failed to establish an equal protection claim.

Consequently, I will grant defendants' summary judgment motion with respect to plaintiff's Fourteenth Amendment claims.

### G. Qualified Immunity

The individual state defendants who are sued in their individual capacities—Rosario, Batts, and Dasilva—argue that they are entitled to qualified immunity. (DE 74-9 at 34). I agree and will grant summary judgment in favor of all the state defendants sued in their individual capacities on all claims against them.

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679. A court may begin its analysis with either prong. *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S. Ct. 808, 818 (2009)). Qualified immunity is an "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985).

The second prong of qualified immunity asks whether the right in issue was so clearly established that the defendants should have known that they were committing a constitutional violation under the circumstances. The courts are cautioned that clearly established law cannot be defined at too high a level of generality. *Thompson v. Howard*, 679 F. App'x 177, 182 (3d Cir. 2017). Still, it is not necessary to demonstrate that prior case law considered the precise factual circumstances presented by the current case. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259–60 (3d Cir. 2010) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances, as long as the law gave the defendant officer fair warning that his [or her] conduct was unconstitutional.") (internal citations and quotations omitted); *see also United States v. Lanier*, 520 U.S. 259, 262, 117 S. Ct. 1219, 1223 (1997). What is required is that the "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

Here, it cannot be said that defendants clearly violated plaintiff's rights in a fashion that is "beyond debate." *Id.* Defendants cite to several cases that support the conclusion that the defendants did not violate a clearly established right based on their conduct in this case. *See, e.g.*, *Bartell v. Lohiser*, 215 F.3d 550, 558 (6th Cir. 2000) (granting qualified immunity when intellectually limited and emotionally troubled mother asserted federal claims after the termination of her parental rights); *In re B.S.*, 166 Vt. 345, 347, 693 A.2d 716, 717 (1997) (affirming termination of parental rights against mentally disabled mother who asserted claims under Title II of the ADA); *In re Welfare of A.J.R.*, 78 Wash. App. 222, 223, 896 P.2d 1298, 1299 (1995) (affirming termination of parental rights of mentally disabled parent who asserted that "the State's failure to provide specialized parenting classes violated the ADA" when the state provided "specific services tailored to [the plaintiff's] developmental disabilities"); *In re Angel B.*, 659 A.2d 277, 278 (Me. 1995); *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 254, 947 S.W.2d 761, 767 (1997); *see*

*also Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 170 (3d Cir. 2016), *as amended* (Mar. 21, 2016).

Plaintiff argues generally that she is not required to identify a prior case that is precisely on point. (*See* DE 95 at 35–36.) That is so, but here the plaintiff has failed to point to any case establishing, even at a more general level, that the conduct of the individual-capacity state defendants in this case violated a clearly established right. Nor has the Court identified any such authority. Without "controlling authority" that indicates a clearly established right, there must be a "robust consensus of cases of persuasive authority" to establish a clearly defined right. *Ashcroft v. al-Kidd,* 563 U.S. 731, 742, 131 S. Ct. 2074, 2084 (2011). That is lacking here. Indeed, a multitude of cases have rejected claims like those of Wilson here.

I therefore must find that the conduct of the individual-capacity state defendants did not violate a right that was clearly established at the time of the alleged misconduct. *Anderson v. Creighton*, 483 U.S. 635, 635, 107 S. Ct. 3034, 3037 (1987) ("[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right."); *Spady*, 800 F.3d at 637 ("When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal citations and quotations omitted)). Consequently, I will grant qualified immunity to the individual-capacity state defendants.[22]

### H. Statute of Limitations

Defendants argue that plaintiff's § 1983 claims are barred by the applicable statute of limitations. (DE 74-9 at 53). Specifically, defendants

---

[22]    Because I rule on the second prong, I do not reach the first prong of the qualified immunity analysis. *See Pearson*, 555 U.S. at 237; *Thompson*, 679 F. App'x at 180.

Qualified immunity not only immunizes state officials from federal claims, but also applies to certain New Jersey state law claims, such as the NJCRA. *See Ramos v. Flowers*, 429 N.J. Super. 13, 24, 56 A.3d 869, 876 (App. Div. 2012). I will therefore dismiss the NJCRA claim in Count 8 as to the individual state defendants on qualified-immunity grounds.



contend that the order terminating plaintiff's parental rights is file stamped May 23, 2011, and that plaintiff filed her Complaint outside of the two-year statutory period. Plaintiff counters that the order terminating her parental rights was actually issued on May 25, 2011 and that the Complaint was timely. (DE 95 at 46). The date discrepancy stems from the order's being stamped as filed on May 23, 2011, whereas the text within the order says that it was entered on the "25th day of May 2011". (DE 74-7).

As an initial matter, defendants are correct that the applicable statute of limitations for plaintiff's § 1983 claims is two years. Section 1983 does not contain its own statute of limitations and instead borrows the limitations period from the law of the forum state, here New Jersey. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In New Jersey, § 1983 claims are subject to the local two-year statute of limitations for personal injury claims, N.J. Stat. Ann. § 2A:14–2. *Patyrak v. Apgar*, 511 F. App'x. 193, 195 (3d Cir. 2013) (per curiam) (citing *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010)).

Furthermore, plaintiff is correct that if the last day of the statutory period falls on a Saturday, Sunday, or legal holiday, "the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Fed. R. Civ. P. 6(a)(1)(C); *see also Bailey v. United Airlines*, 279 F.3d 194, 203 (3d Cir. 2002). If the correct date of the order was May 23, 2011, then the two-year period would have ended on May 23, 2013, a Thursday, and plaintiff's May 28, 2013 filing of the Complaint would be untimely. If the correct date of the order was May 25, 2011, however, the two-year period would have expired on May 25, 2013, a Saturday, and the following Monday, May 27, was Memorial Day, a legal holiday, so that plaintiff's Complaint was timely filed on the following day, May 28, 2013.

I find that the later, May 25, 2011 date controls. The text of the order states that it was issued on May 25, 2011. The order also refers to three hearing dates— "April 20, 21 & May 25, 2011" and it states that the court rendered a decision from the bench "on this date," a fairly clear reference to the May 25, 2011 hearing date. (DE 74-7). If the order had actually been entered

on May 23, 2011, it could not logically have referred to a May 25 hearing that had not yet occurred. I therefore find that the order was entered on May 25, 2011. Consequently, plaintiff's § 1983 claims are timely.

### I. Dr. Dyer and New Jersey's Litigation Privilege

Dr. Dyer argues that the claims against him ought to be dismissed because his participation in Wilson's custody proceedings is protected by New Jersey's absolute litigation privilege. (DE 69-5 at 18). The plaintiff responds that, under the Supremacy Clause, that state-law privilege does not apply in a federal court action for which federal law (here, 42 U.S.C. § 1983) supplies the rule of decision.

On this issue, the starting point is Federal Rule of Evidence 501:

> The common law — as interpreted by United States courts in the light of reason and experience — governs a claim of privilege unless any of the following provides otherwise:
>
> • the United States Constitution;
>
> • a federal statute; or
>
> • rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

The New Jersey state-law litigation privilege, if it applies, clearly would insulate Dr. Dyer from liability.[23] I will not, however, unreflectively apply New Jersey privilege law. Rather, I will consider whether to apply that privilege, or something equivalent, "in the light of reason and experience," *id.,* as a matter of federal common law. While the distinction may be a subtle one, it is worth observing; while borrowing from the state common law is salutary, the federal

---

[23]    Plaintiff virtually concedes that the requisites of the New Jersey litigation privilege, if it applies, are satisfied. Therefore, at a minimum New Jersey's litigation privilege shields Dr. Dyer from plaintiff's claims under New Jersey state law—*i.e.,* the New Jersey Civil Rights Act claim in Count 8. I therefore set that aside and deal with the federal § 1983 claims.

common law approach reserves a measure of independence to adapt or reject state law to accommodate federal policies:

> "A standard way in which federal courts make federal common law is by adopting the law of the state whose law would govern in the absence of federal law, subject to the implicit proviso that the adopted state law be consistent with federal policy." We noted that looking to state law to provide the content of a federal litigation privilege takes advantage of the states' "richer bodies of common law" and serves to "minimize the number of different legal rules to which people are subject."

*Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998) (internal citations omitted; quoting *Baravati v. Josephthal, Lyon & Ross*, 28 F.3d 704 (7th Cir. 1994)).

First, I outline the litigation privilege itself. New Jersey's litigation privilege applies to communications "'(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" *Ashmore v. Ashmore*, 485 F. App'x 597, 599 (3d Cir. 2012) (quoting *Hawkins v. Harris*, 141 N.J. 207, 661 A.2d 284, 289 (1995)). "A statement made in the course of a judicial proceeding is absolutely privileged and wholly immune from liability." *Williams v. Kenney*, 877 A.2d 277, 286 (N.J. App. Div. 2005); *see also Loigman v. Twp. Comm. of Twp. of Middletown*, 889 A.2d 426, 438 (N.J. 2006) (noting the "extraordinary scope" of the litigation privilege in New Jersey law). "The purpose of the privilege is to ensure that participants in the judicial process act without fear of the threat of ruinous civil litigation when performing their respective functions." *Devlin v. Gorski*, No. A-0281-17T1, 2018 WL 5316074, at *2 (N.J. Super. Ct. App. Div. Oct. 29, 2018) (internal citation and quotation omitted).

New Jersey courts have applied the litigation privilege to shield mental health professionals from liability in connection with the recommendations they provide to courts in family law proceedings. *Devlin*, 2018 WL 5316074, at *3; *P.T. v. Richard Hall Cmty. Mental Health Care Ctr.*, 364 N.J. Super. 561,

584, 837 A.2d 436, 449 (Law. Div. 2002), *aff'd*, 364 *N.J. Super.* 460, 837 A.2d 377 (App.Div.2003), *certif. denied*, 180 *N.J.* 150, 849 A.2d 183 (2004) (applying litigation privilege to defendant-psychologist who was designated to serve as the evaluating therapist and prepared a treatment summary at the request of DYFS in relation to plaintiffs' family law proceedings, and noting that the "rationale underlying the litigation privilege itself would be undercut were we to conclude that a therapist. . . in a setting such as this is not entitled to rely on that privilege."); *Delbridge v. Schaeffer*, 238 N.J. Super. 323, 366, 569 A.2d 872, 894 (Law. Div. 1989), *aff'd sub nom.*, *A.D. v. Franco*, 297 N.J. Super. 1, 687 A.2d 748 (App. Div. 1993).

I next consider whether, in the light of reason and experience, the privilege should be applied in this federal-court litigation. I am persuaded that the litigation privilege is consonant with, and indeed deeply embedded in, the common law, and should be honored by a federal court in a § 1983 action.

The most complete and persuasive discussion of the privilege's common law heritage is contained in Justice Albin's opinion in *Loigman v. Twp. Comm. of Twp. of Middletown*, 185 N.J. 566, 584, 889 A.2d 426, 436 (2006), which held that the privilege applied in a § 1983 case brought in state court.

Because the U.S. Supreme Court had not spoken on the precise issue, Justice Albin looked to the Court's approach to "similar immunities that have been raised in the § 1983 context." 889 A.2d at 433. The U.S. Supreme Court long ago "established that § 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Id.* (citing *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S. Ct. 984, 989 (1976)); *see also Rehberg v. Paulk*, 566 U.S. 356, 361, 132 S. Ct. 1497, 1502 (2012).

In deciding the applicability of a privilege, however, the court must apply a two-step analysis:

> [T]he first step is to see whether that privilege was recognized in "tort actions at common law when the Civil Rights Act was enacted in 1871.". . . The second step is to decide "whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions."

*Loigman*, 889 A.2d at 433 (citing *Malley v. Briggs*, 475 U.S. 335, 339–40, 106 S. Ct. 1092, 1095 (1986)).

Justice Albin cited English case law dating back as far as the sixteenth century and Massachusetts case law from 1841 to establish that the litigation privilege has protected statements on the subject of the case made in judicial proceedings. The privilege has been regarded as essential to the administration of justice, a rationale that "has not changed in half a millennium." *Id.* at 434. The privilege was, he concluded, "firmly rooted in the common law as of 1871, the year of passage of the Civil Rights Act." *Id.*

Moving to the second step of the analysis, Justice Albin concluded that the privilege is not merely consistent with, but essential to, the history and purposes of Section 1983.

"In § 1983 actions, the United States Supreme Court has accorded absolute immunity to judges, prosecutors, and witnesses testifying during judicial proceedings. In all three categories, such immunity was well established in the common law." *Id.* at 434. As to witness immunity in particular, "it is clear that § 1983 did not abrogate the absolute immunity existing at common law." *Id.* (citing *Briscoe v. LaHue*, 460 U.S. 325, 334, 103 S. Ct. 1108, 1115 (1983)); *Rehberg*, 566 U.S. at 363.

"The common policy thread that runs through judicial, prosecutorial, and witness immunity is the need to ensure that participants in the judicial process act without fear of the threat of ruinous civil litigation when performing their respective functions." *Id.* Judges and prosecutors, of course, must be free to perform their functions without intimidation, even at the cost of occasional abuse. "Likewise, immunity is conferred on witnesses in § 1983 cases for the purpose of advancing the truth-seeking function of the judicial process. A witness who has to consider the threat of a future civil action resulting from his or her testimony "might be reluctant to come forward to testify" or "his [or her] testimony might be distorted by the fear of subsequent liability." *Id.* at 435 (quoting *Briscoe*, 460 U.S. at 333, 103 S. Ct. at 1114).

49

Drawing on this § 1983 jurisprudence, Justice Albin concluded that "[l]ike judicial, prosecutorial, and witness immunity, the litigation privilege is essential for the proper functioning of our criminal and civil justice systems and is not at odds with the history and purposes of § 1983." *Id.* at 435. He concluded that the New Jersey litigation privilege properly applies in § 1983 cases.

The U.S. Court of Appeals for the Third Circuit, in a non-precedential case, has affirmed the dismissal of a § 1983 claim for the alleged violation of Fourteenth Amendment procedural due process rights on the basis of New Jersey's litigation privilege. *Pasqua v. Cty. of Hunterdon*, 721 F. App'x 215, 219 (3d Cir. 2018). Additionally, multiple cases in this District Court have applied New Jersey's litigation privilege in cases premised on federal causes of action brought against mental health professionals who participated in state family law disputes. *See Calabrese v. New Jersey*, No. 17-4987, 2018 WL 2441763, at *6 (D.N.J. May 31, 2018) (dismissing federal claims against court-appointed psychiatric examiner in custody dispute as barred by New Jersey's litigation privilege); *Bass v. New Jersey*, No. 14-5006, 2016 WL 7638463, at *1 (D.N.J. Nov. 17, 2016), *aff'd*, 689 F. App'x 715 (3d Cir. 2017) (dismissing federal causes of action, including ADA claim, holding that "any cause of action by Plaintiff against [clinical psychologist-defendant] relating to his expert report and testimony associated with the termination of Plaintiff's parental rights cannot stand. . . . and therefore must be dismissed with prejudice pursuant to the litigation privilege."). That said, it does not appear that the Supremacy-Clause issue was raised by the litigants in those cases.[24]

---

[24]    *Waterloov Gutter Prot. Sys. Co. v. Absolute Gutter Prot., L.L.C.*, 64 F. Supp. 2d 398, 413 (D.N.J. 1999), although involving state-law claims, usefully discussed the issue. The cross-claim at issue was one of unfair competition, based on certain attorneys having sent letters alleging patent infringement. The plaintiff asserted, however, that the patent-law aspect invoked a federal interest which weighed against permitting asserting of the privilege. Thoroughly analyzing then-current case law, Judge Orlofsky noted that many of the cases rejecting application of a state-law privilege in a federal-question case arose in the context of contrary federal privilege law, or a threat to the policy of substantive federal law. Distinguishing *Steffes,* Judge

Plaintiff relies primarily on the decision of the U.S. Court of Appeals for the Seventh Circuit in *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998), which held that "[a] state absolute litigation privilege purporting to confer immunity from suit cannot defeat a federal cause of action." In *Steffes*, the plaintiff brought a federal retaliation claim against a former employer under Title VII, *see* 42 U.S.C. § 2000e-3(a), and the ADA, 42 U.S.C. § 12203. While embroiled in litigation with the plaintiff, the employer (acting on instructions of counsel) revealed the existence of the lawsuit to the plaintiff's current employer, allegedly to damage the employee's prospects. The Seventh Circuit held that the Illinois's litigation privilege would not apply in that context. *Id.* The privilege, the court held, "could interfere with the policies underlying the anti-retaliation provisions of Title VII and the ADA" because "actions taken in the course of litigation could constitute retaliation in appropriate circumstances." 144 F.3d at 1075.

*Steffes,* however, is distinguishable. It is § 1983, with its deep roots in the common law of tort, that we are construing here—not the specific statutory provisions of Title VII and the ADA. As discussed above, there is a deep common-law basis for the recognition of the privilege in § 1983 actions. And the U.S. Supreme Court has repeatedly held that recognition of traditional privileges and immunities is consistent with the history and policy of § 1983. *See generally Rehberg*, 566 U.S. 356.

Sitting as a federal common law judge, I draw upon the law of New Jersey and find it appropriate to apply New Jersey's litigation privilege here. As noted above, the plaintiff does not really argue that the privilege, if it applies, would not cover the actions of Dr. Dyer. Dr. Dyer has persuasively argued that all four elements of the privilege are satisfied: He submitted his reports to the family court in relation to the judicial proceedings involving Wilson's parental rights; he was authorized by the court to issue those reports; the reports were

---

Orlofsky held that New Jersey's litigation privilege was applicable because the privilege "would not threaten a federal interest or federally provided-for right." *Id.* at 414.

aimed to achieve the object of the litigation—namely, to help the court resolve custody issues; and those communications had a logical relation to the judicial proceedings. *Hawkins*, 661 A.2d at 289; *P.T.*, 364 N.J. Super. at 583–84. I therefore find that the litigation privilege shields Dr. Dyer from all claims in this suit and will grant him summary judgment on that basis.[25]

## IV.    CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment are granted. All of plaintiff's claims are dismissed with prejudice. An appropriate Order accompanies this Opinion.


Dated: August 23, 2019

**Hon. Kevin McNulty**
**United States District Judge**

---

[25]    Because I dismiss all claims against Dr. Dyer on this ground, I do not reach his arguments regarding absolute immunity, and whether Dr. Dyer can be deemed a state actor under § 1983 and the NJCRA. (DE 69-5 at 22–28).